The court erred in sustaining the general demurrer to the defendant's affidavit of illegality and in dismissing it.
 DECIDED SEPTEMBER 10, 1949. *Page 8 
Dixie Machinery Manufacturing Company foreclosed against the Rome Brick Company what the parties treated as a retention-of-title contract. The contract was for the sale to the defendant of a Non-Clog Swing Hammermill. The defendant filed an affidavit of illegality alleging a breach of express warranty and claiming damages to the extent of the balance due and additional damages to the defendant's business allegedly resulting from the breach of warranty. The affidavit of illegality alleged in part: "1st: The machine or mill levied upon in this case was supposed to have been designed to break up and pulverize materials preparatory to manufacturing the same into brick and the same was purchased from plaintiff for this purpose, and under the contract dated November 1st, 1946, plaintiff made the following warranty as to its performance, etc; — `We guarantee this hammermill will have a capacity of 15 tons per hour of such material as submitted to us for examination and tested, when grinding material of which 90 to 95% will pass through 1/8" mesh when the moisture content does not exceed 15% and that should the moisture content exceed 15% the capacity of this machine should be correspondingly lowered.' . . 4th: From the beginning of said operation it became apparent that said mill would not produce either the quantity or quality of material specified in the said warranty above quoted. A great part of the material produced by said mill would not pass through 1/8 inch mesh as guaranteed, this being at least 50% of said material, the same measuring from 1/4 inch up to 3/4 inch, which size material could not be used in the manufacturing of good brick, this being the business in which defendant was engaged and this was known to plaintiff. The openings in the cage bars furnished by plaintiff with and as a part of said mill would become filled up and clogged with materials which were attempted to be pulverized by said mill, the pulverizing of said materials being the object and purpose for which said mill was designed and intended. As a result of said clogging the casing inclosing the revolving pulverizing mechanism, that is the swinging hammers, became filled with the materials which were undertaken to be pulverized, the time of such filling varying from *Page 9 
30 minutes to a few hours, depending on the rate of feeding the raw material into the mill, however said materials could not be fed to said mill at a rate sufficient to produce as much as five tons per hour without clogging and filling up said casing as hereinabove alleged. As a result of said clogging and filling up of said casing the entire mill would choke down and stop, and as a result thereof it became necessary to shut down defendant's entire plant for about one and one-half to two hours in order to dig out the materials which had clogged up and forced said mill to stop operating. It was necessary to repeat this process several times each day, depending on how fast the mill was fed. Plaintiff was advised of the coarseness of the materials coming from said mill and on or about March 12th, 1947, plaintiff shipped to defendant some other cage bars to be substituted for those coming with said mill originally. These latter bars were substituted and inserted into said mill, however with the same results as above alleged. Plaintiff was again advised of this condition and the fact that said mill would produce neither the quantity nor the quality of materials as guaranteed by plaintiff. Thereupon a representative of plaintiff, C. F. Osborn, visited defendant's plant about April 1st, 1947, and under his directions and supervision a series of swinging baffle plates was made and inserted into said mill in an effort to eliminate the oversize material. With this process completed and the mill started up it was ascertained that practically no production could be secured through said mill after a few minutes operation, said mill clogging up and stopping as aforesaid but in a much shorter period of time. Said Osborn brought and had with him on this occasion a different kind of cage bars, made of thinner metal with round and slotted holes therein which were designed to allow materials to pass through and thereby prevent clogging up and stopping said mill, however these cage bars when inserted into said mill did not have the desired results, the same clogging and stopping of said mill being the result. Said Osborn, on his said visit, installed in said mill a thin type scraper hammers, however these hammers were so fragile that they either broke or wore down so quickly that the use of such hammers was impracticable. Thereupon said Osborn left defendant's plant and went back to St. Louis, Missouri, advising defendant that his company *Page 10 
would undertake to work out some solution of defendant's troubles with said mill, and on April 21st, 1947, plaintiff advised defendant by letter as follows:
"`Rome Brick Company, Rome, Georgia. Attention of Mr. T. C. McCutcheon.
"`Dear Tom, Wish to advise that I have discussed your grinding problems with Mr. Bindner and we are making up a new set of scraper type hammers which we will send to you as soon as they are finished.
"`We are also making up the necessary side panels to raise the top of your mud drum 2 ft., hoping that this will enable you to continue to grind for the time being.
"`We have developed both a moving back and moving top plate and have one unit in the process of manufacture, however, it will require approximately three months to assemble the necessary castings and parts required for this moving plate, so, in order that you may continue to operate, we will send you the extension plates and the hammers, together with necessary instructions for installing same and making the necessary change in the first small cage bars which will eliminate the hammers striking the moving breaker plate.
"`Hoping that I will have the opportunity of visiting you again in the near future,
Very truly yours,
Dixie Machinery Mfg. Co., Charles F. Osborn'
"In the early part of May, 1947, plaintiff shipped to defendant the following items: 1 8 C 16 P.D. V Belt sheave 2-5/8" bore, 5/8 x 5/16 KW for No. 2424 Dixie Premier Non-Clog Hammermill Serial No. 2077, 2 (1 Set) Upper Side Plates 1/4 x 24 x 47" with angles attached by weld for Back End Ext. 1 Upper Back End Cover Plate 1/4 x 24" x 28" for Back End Ext., 18 Special Tee Head Center Hammers, faced with tool steel, heat treated, 4 Special Tee Head End Hammers, faced with tool steel, heat treated. All the above for trial purposes for No. 2424 Dixie Premier Jr. Non-Clog Mill Serial No. 2077. Per B/P of Sk. By C. F. O. dated 4/22/47.
"About the time the above items arrived from St. Louis, Missouri, at defendant's plant the said Osborn also arrived at said plant and during said Osborn's said visit to defendant's *Page 11 
plant various experiments were made under his supervision and directions, he using the parts furnished by plaintiff, none of which eliminated the troubles with said mill hereinbefore enumerated. Said Osborn being unable to get said mill in production returned to St. Louis and on May 26th, 1947, wrote defendant as follows:
"`Rome Brick Co. Attention Mr. T. E. McCutcheon. Please find enclosed our Print No. 2447 on which I have sketched in yellow pencil the new back cover Plate to be installed in your mill. This will close up the back and top of the mill and prevent anything from going over the back and will force all material to go through the Grate bars or screen holes.
"`This will stop the coarse material from going over and it must be close enough to the Hammer circle to keep clay from building up on it. So have suggested 1/4" clearance all around.
"`Let me know how this works out.
 Best regards, Charlie Osborn, Dixie Machy. Mfg. Co.'
"The back cover plate referred to in the foregoing letter was sent to defendant about June 3rd, 1947, and the same was installed in said mill, however said mill still failed to produce either the quantity or quality of materials guaranteed by plaintiff, and after thorough trials said mill continued to clog up and choke down and said plate was removed and plaintiff was advised of the unsuccessful efforts to operate said mill; and, thereupon the said Osborn, in company with Mr. C. M. Bindner, president of plaintiff company, returned to defendant's plant and they again undertook to operate said mill without success after the re-installation of said plate and also new and different parts in said mill which the said Osborn had brought with him, this being on or about June 17th, 1947. Realizing that said mill could not be made to perform as guaranteed they suggested the only way to get production would be to install a one-eighth inch screen and run the materials coming from said mill over it so that the finer and proper size materials would pass into the brick making machine, and the oversize materials not passing through the screen could be returned by a conveyor belt back to said mill to be repulverized. Following this suggestion *Page 12 
defendant built and installed such a screen with necessary conveyor belts, pullies, etc., at a cost of $1200.00 during which time defendant's plant was closed down. With said screen installed and in operation the oversize materials were eliminated from going into the brick mill, however with this screen installed and operating under the most favorable conditions as to dryness of materials the maximum production coming from said hammer mill of materials of the proper sizes and suitable to be allowed to pass into the brick mill did not exceed seven and one-half tons per hour as a maximum, the average being about five tons per hour, however the hammer mill continued to clog up and necessitates cleaning of the same from time to time at a constant expense to defendant. Plaintiff was advised of these conditions and invited to take such steps and do such things as in their judgment would lead to an increase in tonnage and further that defendant would be satisfied with the production of a quantity of material adequate for defendant's then needs even though the same may be below the production guaranteed, these facts being communicated to plaintiff on November 1st, 1947, and since that time plaintiff has not seen fit to further attempt to remedy said hammer mill, it being content to demand payment in full notwithstanding said hammer mill has failed to perform as guaranteed, this fact being well known to plaintiff.
"5th: Defendant has already paid plaintiff as much or more than said hammer mill was worth and defendant feels that under the facts hereinbefore alleged defendant owes plaintiff nothing on the purchase price of said mill.
"6th: Defendant further shows and alleges that it has been injured and damaged by reason of the breach of the warranty made by plaintiff with reference to said mill above set out in the first paragraph of this affidavit of illegality, said breach or warranty resulting in the manner and as hereinbefore set out."
The defendant amended its affidavit by adding the following: "1st: Defendant shows that on October 16th, 1946, it talked with plaintiff over long distance telephone, Rome, Georgia, to St. Louis, Mo., concerning its requirements and desires as to some machine that would answer this defendant's purposes, and in *Page 13 
this conversation plaintiff assured defendant that they could build a machine to answer defendant's purposes and requirements, defendant having seen the advertisement of such equipment by plaintiff, and on October 18th, 1946, defendant confirmed said telephone conversation by writing plaintiff as follows: — This is to confirm our telephone conversation of October 16th when we placed an order for your No. 2424 non-clog hammer mill subject to your assurance that it will satisfactorily pulverize and screen shale to pass 1/8" mesh containing up to 20 or 25% moisture when the feed does not exceed 6" and the output is not in excess of 15 tons per hour and that shipment will be made within six weeks or by December 1, 1946. The price of the hammer mill as quoted, $3,250 F.O.B., St. Louis, Missouri. We have forwarded to you today by prepaid express three samples of shale dug fresh from the pits that we propose to mine. These samples were sealed in metal container to preserve natural moisture. We do not anticipate that the shale that we mine will be wetter than the sample and in dryer seasons will contain less moisture, however, since we do not propose to dry the shale previous to pulverizing it is necessary that the hammer mill pulverize and screen wet shale as well as dry shale. My partner, H. D. McLemore, and I have bought an old brick plant here at Rome. In the past operation of the plant the shale was ground in two dry pans elevated and passed by gravity over 1/8" mesh screens. When the shale was dry no difficulty was experienced in grinding and screening. When the shale was wet expensive drying and handling procedures were resorted to and additional time was required for grinding. We have all the old equipment, it is in place and in working order. If your hammer mill will do a satisfactory job we propose to junk the old equipment, remodel the building by taking off a story and a half that is required for the present elevators and gravity screens. You can readily see that in making this change the expense will involve several thousand dollars besides the cost of the hammer mill and motors. We cannot afford to make the proposed changes without positive assurance that your non-clog hammer mill will be satisfactory. It is therefore necessary that we request from you a guarantee that the No. 2424 non-clog hammer mill will meet our requirements. *Page 14 
The three samples of shale are identified as: 1. Tan shale — Berry Pit 2. Brown shale — Willingham Pit 3. Black shale — Willingham Pit. The tan shale from the Berry Pit seems to be wetter than the other two samples, is softer and contains some clay. We trust that your examination of the shale samples will warrant a guarantee of performance for the hammer mill and that shipment can be made on schedule. As anxious as we are to use your mill we would not want it as a gift should it be unsatisfactory. Will you please try to procure a used 50 HP motor, 3 phase, 220 Volts with starting equipment and the 3 HP motor with same electrical characteristics. Let us know the RPM of the 3 HP motor so that we may also look for this item.'
"To defendant's letter of October 18th, 1946, plaintiff replied on October 23rd, 1946, as follows: `We acknowledge receipt of your letter dated October 18 wherein you confirm long distance telephone conversation authorizing us to proceed with the manufacture of a Dixie No. 2424 Premier Jr. Non Clog Hammermill. The samples of shale mentioned in your long distance telephone conversation, also your letter, have been received, an analysis has been made and we feel quite confident that no trouble will be experienced in reducing this material in the Dixie Non Clog Hammermill. We suggest, however, that in order to secure a good uniform product the hammer mill be operated in closed circuit with a screen. When reducing materials in a hammer mill of this type, it is impossible to secure 100% results, therefore, the suggestion of operating in closed circuit. If in your process some larger sizes than 1/8" can be used, then, the screen can be eliminated. The product generally obtained from a unit of this type will be 90 to 95% passing 1/8", the maximum size of the balance would not exceed 1/4." We have instructed our shop to proceed with the manufacture of Dixie No. 2424 Hammermill and from all indications, we believe that shipment can be made on or about December 1st of this year. Contracts covering this transaction are being enclosed for your signatures and suggest that both you and your partner, Mr. H. D. McLemore, sign them. The writer neglected to advise you in long distance telephone conversation that a 25% cash payment is usually required in a transaction of this type and we hope that when you return the signed contracts covering this transaction, *Page 15 
you will include your check for the amount required. At the same time, we suggest that you give us credit references so these may be investigated and all of these matters cleared before shipping date of the unit. Up to the present time, we have not been able to secure a 50 HP or a 3 HP motor for driving the hammer mill and breaker plate, but will continue our efforts and hope to locate this equipment and have same ready for shipment at the time the crusher goes out. Again thanking you for this valued business, we remain,'
"And thereupon defendant replied to plaintiff on October 28th. 1946, as follows: `I was glad to learn from my telephone conversation today that you experienced no difficulty in grinding the moist shale samples I forwarded to you for tests. I am also pleased to know that Mr. Oberhellman in his letter of October 23rd expressing confidence that the number 2424 non clog hammer mill will satisfactorily meet our requirements. I mention to you on the phone that your proposal of October 23rd did not specify the tonnage, screening, and performance of the machine when the shale is moist or wet, and does not give us the assurance and guarantee requested in my letter of October 18th. Will you please forward us a new proposal covering this guarantee so that the order may be completed. I understand from our telephone conversation today that you are going to look up installations of non clog hammer mills that we might conveniently inspect.'
"As a result of conversations over long distance telephone and letters passing between plaintiff and defendant the contract sued on was executed between plaintiff and defendant with the guarantee or warranty set forth in defendant's original answer and as shown by said contract.
"Defendant shows that by reason of the facts herein set forth plaintiff was fully advised of defendant's wants and requirements and the purposes to which the machine in question was to be applied and used by defendant; and defendant shows further that it had never had any experience with such a machine and relied on plaintiff's experience, assurance and warranty.
"2nd: Defendant shows further that such a mill as plaintiff contracted to sell and warranted to defendant is and was at the time such machinery as is not sold in the open market. *Page 16 
"3rd: Defendant shows further that had said mill performed as warranted by plaintiff, defendant could have operated the same to its full capacity in connection with its brick plant and could have sold said plant's entire output of brick, there being such a demand for defendant's output of brick at all times since defendant received and installed said mill for operation.
"4th: Defendant shows further that said mill was of such a kind and nature that it was impossible for defendant, by examination and inspection, to determine whether it came up to the warranty of the same by plaintiff, and its true nature and qualities could be discovered only after its delivery to defendant in Rome, Georgia, at defendant's plant and then only after the same had been installed and attempts made to operate the same.
"5th: Defendant amends its claim for damages as set out and made a part of paragraph six of its original answer and supplements said claim as set forth on the sheet hereto attached.
"6th: Defendant amends the 4th paragraph of its original answer and shows that immediately prior to March 12th, 1947, defendant advised plaintiff not only of the coarseness of the material coming from said mill when defendant attempted to operate the same but also of the fact that said mill would fill, clog up and choke down, and when defendant installed said parts shipped by plaintiff to defendant on or about March 12th, 1947, said mill continued to clog up, and choke down, of which plaintiff was advised; and further on the visit of said Osborn to defendant's plant on or about April 1st, 1947, defendant was advised that the installation of said swinging baffle boards would eliminate clogging and choking down of said mill, however the results of defendant's attempt to operate said mill met with the results set out in said 4th paragraph; and after the experiments made by said Osborn on his visit to defendant's plant in early May, 1947, said mill continued to fill, clog up and stop, this being repeated many times daily necessitating the closing down of not only said mill but also defendant's brick making machine while said mill was being cleaned out. Defendant further amends said 4th paragraph and shows that said screen mentioned in said paragraph was installed, with the additional equipment going therewith, at the instance of plaintiff and on assurance by *Page 17 
plaintiff to defendant that upon this being done if said mill continued to clog up plaintiff would eliminate said filling up and clogging which had caused said mill to choke down and stop. Defendant was at first undecided from a practical standpoint whether it was the best thing to do to install said screen, however due to the fact that defendant had already spent so much money relying on said warranty of plaintiff and had wrecked that part of its plant said mill was supposed to take the place of and could not be replaced without an additional expense of some few thousands of dollars defendant decided to make one more effort to place said mill in production by the installation of said screen and other necessary equipment going therewith and relying on assurances of plaintiff that it would eliminate said clogging which had caused said mill to choke down and stop, it began to assemble all necessary parts going therewith and did assemble, build and install said screen with its necessary parts and undertook to operate said mill in connection therewith with the results set out in said 4th paragraph.
"7th: Defendant amends said 4th paragraph further and shows that defendant heard nothing further from plaintiff until about July, 1948, when said Osborn visited defendant's plant at which time he learned that said mill was still choking down, clogging and stopping from time to time, however he had no suggestion to make as to remedying the same. Here the matter stood, defendant continuing to operate its plant with said mill as best it could and on September 29th, 1948, plaintiff, notwithstanding all of its efforts and those of defendant to operate said mill and knowing that the same failed to meet said warranty under which defendant contracted for the same, advised defendant that plaintiff specifically denied that said mill will not perform `according to the original contract entered into.' On October 7th, 1948, defendant again called on plaintiff to place said mill in good operating condition, which plaintiff ignored and placed the matter in the hands of their attorney, and thereupon on October 20th, 1948, defendant offered to return said mill to plaintiff upon the refunding by plaintiff sums paid by defendant thereon, which offer was rejected and refused by plaintiff.
"8th: Defendant further amends its original answer and shows that it cooperated with plaintiff in every way it could to *Page 18 
get said mill in operation in order to keep down loss and damage not only to defendant but also to plaintiff, and defendant shows further that it has never accepted said mill as fulfilling said warranty under which it was contracted for, but on the contrary protested to plaintiff from the beginning of the attempts to operate said mill, and from time to time as heretofore alleged, that said mill was not performing as provided in said contract of purchase, and plaintiff either could not or would not replace said mill and defendant was placed by the failure of plaintiff to perform its obligations under said contract, in a situation where an outright rescission of said contract following defendant's and plaintiff's first efforts to operate said mill would not afford defendant complete relief and for this reason plaintiff continued to cooperate with plaintiff in its said efforts until plaintiff finally denied that said mill was not as warranted.
"9th: Defendant amends the 5th paragraph of its original answer and shows that said mill was not worth on the market or otherwise as much as defendant has already paid plaintiff on said mill and defendant shows that the consideration to the extent of the amount over and above that paid by defendant on said mill has failed.
"1. Machinery Warranty: (a) By the acceptance of this contract you agree: that, within ________________ days after you have received the machinery, you will install the same in your plant located at ____________ in the State of _____________ according to our instruction, upon a proper foundation to be provided by you; that you will operate the machine according to our instructions and at a speed, under load, of ________________ R.P.M., for a period of _____________ consecutive days immediately following said period allowed for installation; that, if the said machine should not _______________
"When so operated, you will immediately notify us of the fact, and we are to have the privilege of making changes in the machine, if we desire, forwarding any substituted or additional parts to you, upon which you are to pay the freight. After completion of the changes, if any are made by us, you are to have a further period of _______ days to try the machine. Should the same not have the capacity to grind to the fineness mentioned above, you are to have the right to reject the *Page 19 
machine, providing that on or before the day of expiration of the first period above named, or in the event of changes by us, then on or before the day of expiration of said additional period, you notify us in writing of such rejection, and place the machine and all appliances furnished you therewith on board car at your station, in as good condition as when received by you, less natural wear and tear, but not excepting damages by fire or the elements, billing the machine to us, forwarding the bill of lading, and paying freight charges both ways; otherwise the machine is to be considered accepted. Upon rejection and return of the machine within the time and manner aforesaid, we will refund any advance payments made by you upon the purchase price."
The plaintiff filed general and special demurrers to the original affidavit, objected to the allowance of the amendment, and renewed its demurrers to the affidavit as amended. The court passed the following order: "Over the objection of plaintiff that there is nothing to amend by and that the same sets forth prior negotiations with respect to the sale of the property involved which were merged into the written contract sued upon and sets forth a new agreement which is without consideration, this amendment is allowed, and plaintiff insisting on its general demurrer to defendant's answer as amended but not waiving its special demurrers said general demurrer is sustained and defendant's answer as amended is stricken." To this judgment defendant excepts.
The defendant below contends that under the pleadings in the case there were three warranties of the machinery bought by it: (1) a warranty that it would not clog; (2) a warranty that it had a capacity of 15 tons per hour when the moisture content of the material did not exceed 15%; and (3) a warranty that 90 to 95% of the material when ground would pass through 1/8" mesh when the moisture did not exceed 15%. The plaintiff below contends that there was no warranty that the machine would never clog but that the warranty only extended to the circumstances and conditions stated in the warranty, that even if the second warranty was breached the defendant *Page 20 
waived it by not rescinding the contract as it contended the contract provided; and that the contract contained no warranty that the machine would grind to a particular fineness.
1. The description of the machine as a non-clog machine should be construed in connection with the other warranties and the circumstances and facts leading up to the contract to mean that the machine would not clog when it was putting out a finished product from 90 to 95% of which would pass through a 1/8-inch screen when the moisture was 15%. As to this warranty when the moisture was greater it should be construed to mean that the machine would not clog when the moisture was not unreasonably greater than 15%.
2. The defendant below did not waive whatever breach of warranty there was as to the capacity of the machine. The provision in the contract with reference to rescinding applies only to a breach of the warranty as to the particular fineness to which the machine was warranted to grind. The contract did not expressly or by implication exclude remedies for the breach of other warranties. "A right to return when exclusive, will be restricted to that warranty to which it relates and will not bar a claim for the breach of another independent warranty." Ann. Cases 1915 D, pp. 1157-1159; 55 C.J., p. 810; 30 A.L.R. 293. InLyon v. Williams Patent Crusher c. Co., 26 Ga. App. 760
(107 S.E. 590), there was no warranty as to capacity or fineness but a mere provision for rescission if the machine did not do certain work. If there is any ruling in that case contrary to what is here held it is disapproved. The allegations in the affidavit as amended are sufficient as against a general demurrer to allege a breach of all the warranties as construed by this court.
3. The provision in the contract, "We guarantee that this hammer mill will have a capacity of 15 tons per hour of such material as submitted to us for examination and tested, when grinding material of which 90 to 95% will pass through 1/8" mesh when the moisture content does not exceed 15%, and that should the moisture content exceed 15% the capacity of this machine should be correspondingly lowered," standing alone is ambiguous and could mean that the material which would pass through a 1/8" screen applied either to the material before it *Page 21 
was ground or to the material after it was ground. But, construed in the light of all the facts alleged, the request for particular warranties, the statements in the letter accompanying the contract, and the provision in the contract permitting a rescission if the machine did not grind "to the fineness mentioned above." and in the absence of further facts evidencing a different intention, the contract means that the machine is warranted as to the capacity stated and that it will grind the material similar to the sample tested to such a fineness that 90 to 95% of the material would pass through a 1/8-inch screenafter it was processed. As against a general demurrer the affidavit alleges a breach of this warranty. It alleges a breach generally which includes the allegation that the proper material was put into the machine, and the facts alleged show that no contention was made by the plaintiff that improper material was used. "Covenants of warranty should be so construed as to require and encourage the utmost good faith in all the contracting parties." Code, § 96-302. Under the facts this principle requires the interpretation that we have placed on the warranties in the contract here involved, and it seems idle to repeat the circumstances set forth in the statement of facts: The court erred in sustaining the general demurrer to the affidavit and in dismissing it.
Judgment reversed. Sutton, C. J., and Worrill, J., concur.